## COREY v. WALDO.

HOMESTEAD—EXEMPTION.

A married woman owned a house and lot, where she lived with her husband, neither having any other home. The lot was condemned by the city in street-opening proceedings, and an award of damages made to the wife, who thereupon borrowed money on an assignment of the award, and with it made a part payment on a lot for a new home, the contract being taken in the name of the husband. The second lot was vacant and unimproved, and so remained for 14 months after the purchase, when it was levied on by an execution creditor of the husband. After the levy, the wife bought the house on the first lot from the city, the parties having in the meantime continued to reside therein, and it was moved onto the new lot. *Held*, that such lot was exempt from execution as a homestead.

Appeal from Wayne; Waite, J. Submitted May 7, 1901. Decided May 21, 1901.

Bill by Lorenzo Corey against George H. Waldo, James D. Candler, Maria L. Candler, John Wesley, and Georgiana Wesley in aid of execution. From a decree for complainant, defendant Waldo appeals. Reversed.

*Palmer & Palmer* (*B. D. York*, of counsel), for complainant:

A homestead cannot exist in intention alone; there must be some sort of occupancy. *Stanton* v. *Hitchcock*, 64 Mich. 316 (31 N. W. 395, 8 Am. St. Rep. 821); *Lawrence* v. *Morse*, 122 Mich. 269 (80 N. W. 1087); *Smith* v. *Kidd*, 123 Mich. 193 (81 N. W. 1092). And a family can have but one homestead at the same time. *Wheeler* v. *Smith*, 62 Mich. 373 (28 N. W. 907); *Kruger* v. *Le·Blanc*, 75 Mich. 424 (42 N. W. 853); *McMonegal* v. *Wilson*, 103 Mich. 264 (61 N. W. 495).

*Ignatius J. Salliotte*, for appellant.

MOORE, J.    April 11, 1900, complainant obtained a
judgment in the Wayne circuit court against George H.
Waldo and Alden M. Varney.    On the 12th of April,
1900, an execution was issued, and a levy made upon a
42-foot lot in Detroit.    On the 13th of April, 1900, this
case was commenced, and is a bill filed in aid of execu-
tion.    Mr. Waldo filed an answer to the bill, in which he
disclaimed any interest in the land levied upon, and as-
serted it was the property of his wife, bought by her for a
homestead, and claiming the benefit of a homestead, even
if the interest in said land belonged to him.    The Wesleys
also answered, stating they were aware, at the time the
sale of the land was made, that Mrs. Waldo furnished the
money paid thereon.    The case was heard, and a decree
rendered in favor of complainant, from which decree Mr.
Waldo has brought the case here by appeal.

The facts are not in dispute.    Briefly stated, they are as
follows: Prior to May, 1898, Mrs. Waldo had been the
owner for some years of a house and lot in the city of
Detroit, where she, with her husband and family, resided.
It was the only home she and her husband or either of them
possessed.    The city of Detroit desired to extend Second
avenue north to the city limits.    The house and lot owned
by Mrs. Waldo stood in the way of this extension.    Pro-
ceedings were commenced by the city to condemn this lot
for the opening of Second avenue.    There was a mortgage
upon the lot.    The land was condemned.    Mrs. Waldo was
awarded $2,341.68, and the mortgagee $2,248.58.    This
judgment was confirmed by the court June 6, 1898.    On
account of some delay in collecting the taxes, the amount
awarded to Mrs. Waldo was not paid over at once.    When
the judgment against her property was confirmed, Mrs.
Waldo began at once to look for a lot upon which she
could establish another home.    She expected the city,
having no use for the house in which she had lived so
long, would sell it, and that she might become its pur-
chaser, and move it upon the lot which she might buy.
In case she did not buy the house, she expected, with the

proceeds of the award, to build a new house. She found a lot that suited her, and, not having the money to pay for it, as the award to be paid by the city had not been paid to her, she arranged with Mr. Butzel to loan her $500, and assigned to him as security the judgment which had been awarded to her, and also authorized him to deed the property which had been condemned to the city. This instrument was executed December 3, 1898, acknowledged, and filed in the office of the city controller. With the money obtained from Mr. Butzel, Mrs. Waldo purchased a lot, which was deeded to her. This lot adjoined other lots owned by clients of a real-estate firm in Detroit, who greatly desired to possess it, to go with the lots they owned. An arrangement was then made that this lot should be deeded by Mrs. Waldo, and the proceeds used as part payment for the lot involved in this litigation, which was then owned by Mr. Candler, which lot also had a mortgage upon it. Mrs. Waldo realized from a sale of the lot a balance of $738, which was applied on the payment for the Candler lot. She had not yet received through Mr. Butzel the amount awarded her by the city, and the real-estate agents arranged with Mr. Wesley to loan upon the lot which was owned by Mr. Candler $950. To secure this loan, the arrangement was, the Candlers were to deed the lot to Mr. Wesley, and he was to give a contract to convey the land upon the payment to him of the $950 and interest. The Candlers and Mr. Wesley all knew the lot was to be obtained for the purpose of making a home for the Waldos, and they also knew that the funds to purchase the same came or were to come from Mrs. Waldo. Mr. Candler made a deed of the land to Mr. Wesley, and a contract was drawn running from Mr. Wesley to Mrs. Waldo. It was presented to Mr. Wesley for signature, and he declared he did not want to deal with a woman, and insisted that Mr. Waldo should sign the contract, and that it should run to him, but agreed that, when $300 should be paid on the contract, it might be assigned by Mr. Waldo to any one.

.Mrs. Waldo was not present when this arrangement was made, though there is testimony which indicates she knew of the arrangement shortly thereafter, and acquiesced in it. The deed from Candler to Wesley and the land contract were made February 14, 1899. The land contract was not acknowledged, and was not recorded. Of the money received from Mr. Wesley, $615 was paid to the holder of the mortgage upon the Candler lot, and the balance was paid to Mr. Candler. The Candler lot was valued at $1,688 in the transaction, and, when the levy in this case was made, there was unpaid to Mr. Wesley $950 and some interest. In April, but after the levy was made, the Waldos put out a willow hedge, and still later Mrs. Waldo purchased the house from the city, and while the Waldos were still living in it the house was moved upon the lot in question.

Two claims are made by counsel why the decree should not stand: *First*, the lot levied upon was a homestead; *second*, that Mrs. Waldo owned the property. We think it necessary to discuss only the first of these questions. It has always been the policy in this State to secure, so far as possible, for every family, a home, which should inure to the benefit of the entire family. A provision intended to bring about such a result was put into the Constitution. Article 16, § 2. As long ago as 1848 a statute was enacted for the same purpose. 3 Comp. Laws 1897, § 10362. This constitutional provision and the statutory enactment have frequently been construed by this court. In *Barker* v. *Rorabeck*, 36 Mich. 399 (Justice COOLEY speaking for the court), it was said provisions exempting a homestead from execution are to be liberally construed, especially where the exemption is restricted within limits so very moderate as those prescribed in this State. See, also, *Reske* v. *Reske*, 51 Mich. 541 (16 N. W. 895, 47 Am. Rep. 594); *Deville* v. *Widoe*, 64 Mich. 593 (31 N. W. 533, 8 Am. St. Rep. 852); *Mills* v. *Hobbs*, 76 Mich. 122 (42 N. W. 1084); *Lamont* v. *Le Fevre*, 96 Mich. 175 (55 N. W. 687). In *Reske* v. *Reske*, Justice COOLEY uses the following language:

"The question now is whether, on the facts recited, the lot had become a homestead, in a legal sense, before the levy was made upon it. We are of opinion it had. The lot, as has been said, was procured for the purposes of a home; and complainant, aided by the industry and frugality of his wife, was proceeding to make it such as rapidly as their limited means would permit. They inclosed it; they had their domestic animals upon it; they came to live in the immediate vicinity; they made a well; and they put up outbuildings. Everything but the dwelling proper had been erected before the levy was made, and complainant was bargaining with a builder for a house. If anything was lacking to make the lot a homestead, it was because the poverty of complainant had precluded his advancing his improvements as rapidly as he desired. The lot, however, in the minds and hearts of complainant and his wife, had been appropriated as a home from before the day of their marriage. It was all the home they had. It represented all their scanty means, and was the center of their domestic hopes and aspirations. They did not, as yet, sleep upon it, or take their meals upon it; and, probably if they had done this in some of the buildings already constructed, their right to claim a homestead would not have been disputed. But this is not an indispensable condition. The man who buys a home which is all ready for occupancy cannot have it taken from him as he is attempting to move in his goods, because he has not yet eaten or slept within it. Any one might be deprived of a homestead if so narrow a construction of the privilege should prevail."

See, also, *Bowles* v. *Hoard*, 71 Mich. 154 (39 N. W. 24); *Kaeding* v. *Joachimsthal*, 98 Mich. 78 (56 N. W. 1101); *Myers* v. *Weaver*, 101 Mich. 477 (59 N. W. 810).

In the case before us, Mr. and Mrs. Waldo were attempting in the utmost good faith, with the proceeds of a homestead of which they had been deprived by the action of the city, to establish a new home. To accomplish this purpose, they were proceeding just as rapidly as the circumstances would permit. There is not a fact in the record that suggests any attempt to deprive any creditor of Mr. Waldo of any right. The facts all show a purpose on the part of the Waldos, when deprived of one home, to establish another. Such a purpose ought not to be defeated by

so technical a construction of the statute and the constitutional provision as the complainant contends for.

The decree is reversed, and the bill of complaint is dismissed, with costs of both courts.

The other Justices concurred.